IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LAREINE UDELL STEINFELD, | ) | |
| | ) | |
| Plaintiff, | ) | No. 20 CV 5838 |
| | ) | |
| v. | ) | Judge Jeffrey I. Cummings |
| | ) | |
| JONES LANG LASALLE AMERICAS, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lareine Udell Steinfeld ("Steinfeld") brings this case against her former employer, defendant Jones Lang LaSalle Americas, Inc. ("JLL"), alleging three federal causes of action: (1) whistleblower retaliation in violation of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. §1514A, *et seq.*; (2) whistleblower retaliation in violation of the Taxpayer First Act ("TFA"), 26 U.S.C. §7623, *et seq.*; and (3) violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201 *et seq.* Steinfeld further alleges three state law claims against JLL—namely, breach of contract, unpaid wages, and unjust enrichment. JLL, in turn, brings four state law counterclaims against Steinfeld, alleging defamation *per se*, defamation *per quod*, breach of contract, and breach of fiduciary duty.

Before the Court is JLL's motion for summary judgment. (Dckt. #200). JLL argues, among other things, that summary judgment on Steinfeld's federal whistleblower claims is proper because Steinfeld did not engage in "protected activity," as required by both SOX and the TFA. JLL further argues that summary judgment is proper on Steinfeld's FLSA claim because she falls under the FLSA's "highly compensated employee" exemption. For the reasons set forth below, the Court agrees. JLL's motion for summary judgment is therefore granted as to

Steinfeld's federal claims, and Steinfeld's state law claims and JLL's state law counterclaims are dismissed without prejudice.

## I.      LEGAL STANDARD

### A.      Standard for Summary Judgment

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment *unless* it is a genuine dispute as to a material fact).

When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248. Of course, "[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

## II.     EVIDENCE CONSIDERED BY THE COURT ON SUMMARY JUDGMENT

Each party argues that the Court cannot consider certain evidence submitted by the opposing party in ruling on JLL's motion for summary judgment. Several of these disputes involve exhibits that are not germane to the issues that the Court reaches in this Memorandum Order and Opinion; therefore, the Court will not address the parties' arguments with respect to those exhibits. The Court does, however, reach the parties' dispute regarding the declaration submitted by Steinfeld in support of her opposition to JLL's motion for summary judgment (the "Declaration"). (*See* Dckt. #238-1 at 289–95). JLL argues that the Declaration is improper because it (1) attempts to convert Steinfeld's complaint into sworn testimony by simply reiterating her allegations into the Declaration; (2) disputes sworn statements in the record; (3) attempts to raise new issues; and (4) contains numerous errors. (*See* Dckt. #246 at 7–8).

In general, "self-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment." *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 459–60 (7th Cir. 2014). But this method is not without limits, and "a nonmoving party at the summary judgment stage cannot rest upon conclusory statements in affidavits; [they] must go beyond the pleadings and support [their] contentions with proper documentary evidence." *Foster v. PNC Bank, Nat'l Ass'n*, 52 F.4th 315, 320 (7th Cir. 2022) (cleaned up). Moreover, an affidavit will fail to thwart summary judgment if it is not based on personal knowledge as required by the Federal Rules.

*Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (citing Fed. R. Civ. P. 56(e) and Fed. R. Evid. 602). Accordingly, the Court will consider the Declaration to the extent that Steinfeld's statements are supported with the proper documentary evidence and/or based on her personal knowledge.

### III.    FACTUAL RECORD

The Court draws the factual record from the parties' pleadings; JLL's statement of material facts ("DSOF") and its accompanying exhibits, (Dckt. ##202–05); plaintiff's response to DSOF ("DSOF Resp.") (Dckt. #236); JLL's reply in support of DSOF ("DSOF Reply") and its accompanying exhibits, (Dckt. #247 to #247-5); plaintiff's statement of additional facts ("PSAF") and its accompanying exhibits, (Dckt. #238 to #238-11), and JLL's response to PSAF ("PSAF Resp.") and its accompanying exhibits, (Dckt. #248 to #248-4). The following facts are undisputed unless otherwise noted:[1]

### A.    Steinfeld's Work History and Transfer to JLL's Atlanta Office.

Steinfeld is an experienced commercial real estate broker who worked at CBRE and other commercial real estate firms before joining JLL's Miami office as a commercial real estate broker in 2011. (PSAF Resp. ¶1). In 2015, JLL asked Steinfeld to participate in a mentoring program that it characterized as a "high privilege" for "high performers." (*Id.* ¶3). Through the program, JLL paired Steinfeld with David Tennery ("Tennery"), a senior broker who had taken over JLL's Atlanta Office Investment Services ("OIS") team earlier the same year, and the two discussed the possibility of Steinfeld transferring to Atlanta as a result of their professional relationship. (*Id.*). Prior to formally offering Steinfeld a role in Atlanta, JLL evaluated her and

---

[1] On many occasions, Steinfeld violates Local Rule 56.1(b)(3)(B) by failing to cite evidence that supports her dispute of the facts proffered by JLL. In these instances, JLL's facts, where supported, are deemed admitted.

4

determined she was "a strong performer." (*Id.* ¶5). Steinfeld had reservations about moving to Atlanta, including concerns about financial security, given that she would have to relocate her family, including her three children. (*Id.* ¶4; Dckt. #238-1 at 287). Nevertheless, she ultimately accepted the job and, in 2016, joined JLL's Atlanta Capital Markets Group. (DSOF Reply ¶9).

### B. The Agreement.

In connection with her role in the Atlanta office, Steinfeld negotiated and executed an Employment Agreement, dated August 1, 2016 (the "Agreement"). (DSOF Reply ¶12; Dckt. #203-8). The Agreement provided, among other things, that JLL would pay Steinfeld a bonus of $300,000 based on her relocation to Atlanta, but also noted "[i]n the event that [Steinfeld] le[ft her] employment with [JLL] within five (5) years . . . [she would] immediately repay to [JLL] the pro rata portion of the bonus . . ." (Dckt. #203-8 at 6). The Agreement further detailed that Steinfeld's "primary duty for [JLL was] making sales or obtaining orders or contracts for commercial real estate services . . ." (DSOF Reply ¶12; Dckt. #203-8 at 2). More broadly, Steinfeld's duties included "generating revenue through sales," "communicating with potential investors and buyers," and "negotiating sales." (Dckt. #1 ¶28).

### C. Steinfeld's Compensation From 2016–2019.

During her time in JLL's Atlanta office, Steinfeld reported to Tennery, but the two were "fifty-fifty financial partners." (PSAF Resp. ¶9; Dckt. #203-11 at 44). From 2016 to 2019, Steinfeld's compensation ranged between approximately $227,000 and $846,000 annually.[2]

---

[2] Specifically, Steinfeld's compensation was $470,682.96 in 2016, (Dckt. #204-11 at 2); $227,621.23 in 2017, (Dckt. #204-10 at 2); $849,874.13 in 2018, (Dckt. #203-21 at 2); and $273,615.66 in 2019, (Dckt. #204-9 at 2).

### D.    The Holdback Accounts.

Brokerage teams at JLL (like the one that Steinfeld and Tennery were a part of) had the option to utilize holdback accounts, which are general ledger accounts to which brokers may allocate revenue from closed deals when they have not yet fully determined how to distribute the revenue. (DSOF Reply ¶21). The holdback accounts are accounted for in JLL's financial statements, and those statements are reviewed annually by a third-party auditor. (DSOF Resp. ¶23; Dckt. #203-9 at 47). Steinfeld first learned of these accounts from Tennery in November 2016, after their team closed their first sale, (Dckt. #238-1 at 288), and, at the time, Tennery believed that the holdbacks were mandatory, (*id.* at 430). The holdbacks varied but ultimately settled at three percent for staff bonuses and six percent for team expenses. (PSAF Resp. ¶13; Dckt. ##203-6 at 14, 238-1 at 430). Steinfeld had not encountered a similar holdback practice at her prior firms, nor in her prior employment with JLL. (Dckt. #238-1 at 288).

### E.    Steinfeld's Concerns with the Holdback Accounts and JLL's Subsequent Investigations.

According to Steinfeld, Tennery managed the team's holdback accounts, including the holdback for staff bonuses, and "the administrative staff did not seem to receive bonuses in keeping with the amounts being held back," which caused staff "departures." (PSAF Resp. ¶13; *see also* Dckt. #238-1 at 288). As a result of these departures, Steinfeld sought to oversee the allocations of the holdbacks in the accounts. (Dckt. #238-1 at 288). Steinfeld was also "concerned with [a] lack of transparency and seemingly inconsistent . . . expenses" that she was incurring. (PSAF Resp. ¶14; *see also* Dckt. #238-1 at 288–89). Her concerns were heightened in February 25, 2019 when she and others received an email from at International Director at JLL indicating that the "Atlanta Market ha[d] the highest Travel & Entertainment (T&E) spend of any Market in the Americas, and [the] Capital Markets team ha[d] the highest T&E spend of all

6

Atlanta Market business lines." (PSAF Resp. ¶15; Dckt. #238-3 at 110). Steinfeld emailed JLL's finance department about the holdbacks, to which a representative replied that he did not know the "intent [of] the 6% holdback for [Steinfeld's] group." (PSAF Resp. ¶16; Dckt. #238-3 at 112).

Steinfeld ultimately grew suspicious that Tennery was improperly using the holdback accounts to reimburse personal travel expenses like first-class plane travel, luxury hotel rooms, and ski trips. (PSAF Resp. ¶18; Dckt. #238-1 at 289). According to Steinfeld, on more than one occasion, Tennery submitted a client invoice that exceeded actual deal expenses without any supporting evidence for those expenses, yet JLL collected wire payment from its client for the excess expense amount. (*Id.*). It was Steinfeld's belief that Tennery's conduct was fraudulent and that JLL's acceptance of Tennery's allegedly "ill-gotten" gains harmed shareholders and investors. (*Id.*). Moreover, according to Steinfeld, once she learned more about holdback accounts and JLL's use of expenses, she became concerned that JLL's practices constituted tax or securities violations. (Dckt. #238-1 at 290).

On July 1, 2019, JLL acquired HFF, Inc. ("HFF"), one of its competitors. (PSAF Resp. ¶¶19–20). Following the completion of the merger, Steinfeld reached out to, and in some instances met with, several JLL employees to discuss her concerns about Tennery's expenses, among other concerns. Those employees included:

- Richard Reid, the new co-lead of the Atlanta OIS division, (*id.* ¶20);

- Lucille Heil, the Senior Vice President of Operations of the Atlanta Region, (*id.* ¶22);

- Nancy Norman, JLL's Ethics Officer, (*id.* ¶23); and

- Mike Sivewright, JLL's Market Director, (*id.*).

JLL began an investigation into Steinfeld's concerns. (DSOF Reply ¶43).

7

On July 31, 2019, Steinfeld emailed Katie McNaughton, a Capital Markets HR team member, and Sivewright, expressing concerns about "expenses that might have been billed."[3] (PSAF Resp. ¶25). The following day, August 1, 2019, Steinfeld met with Sivewright and Heil to discuss her email, at which point Sivewright informed Steinfeld that JLL investigated and found: (1) no wrongdoing; (2) that Steinfeld's team's holdback accounts were not being used to pay for team expenses; and (3) that Steinfeld was not responsible, and did not pay, for her team's expenses. (DSOF Reply ¶43). Sivewright also informed Steinfeld that JLL's finance team had determined her team's holdback balance for 2018 and that she would receive fifty percent of the amount, which was $120,756.08. (PSAF Resp. ¶¶26–27).

Steinfeld disagreed with JLL's conclusions and continued to send emails to other JLL employees, like Heil, detailing transactions that she believed were "incorrect" or amounted to "discrepancies." (*Id.* ¶27). After Sivewright communicated JLL's findings to Steinfeld on August 1, 2019, Steinfeld also alleged, for the first time, that Tennery concealed revenue from her and that she was owed an additional $596,000. (DSOF Reply ¶66). JLL investigated and concluded that the only transactions that Tennery (but not Steinfeld) was compensated for involved deals outside of the Capital Markets group or deals that started before Steinfeld transferred to Atlanta, and on which she never worked. (*Id.* ¶67).

From August through October 2019, Steinfeld continued to ask to see the team's expenses and to raise her concerns about the use of the holdback accounts, perceived discrepancies in JLL's accounting systems, concealed revenue, and the alleged unlicensed practice of real estate in certain jurisdictions. (PSAF Resp. ¶¶29, 46, 51; Dckt. #205-2). She also created spreadsheets

---

[3] Plaintiff argues that she attached a spreadsheet to her July 31, 2019 email that detailed certain expenses. (PSAF Resp. ¶25). However, the versions of the emails that plaintiff submitted as exhibits in support of her opposition to defendant's motion for summary judgment do not include the referenced spreadsheet. (*See* Dckt. #238-7 at 8, 11–12).

that she claimed contained certain concerning expenses, (DSOF Reply ¶54; PSAF Resp. ¶25; Dckt. #238-7 at 8), and sent emails identifying areas of concern, including securities rules, "creation of holdback accounts," "contracts," "jurisdiction," "expenses," IRS code sections, and accounting standards. (Dckt. #205-8 at 2–3).

In response, JLL did not allow Steinfeld to see other team members' expenses, (Dckt. #203-15 at 42), but investigated Steinfeld's concerns by collecting documents, interviewing witnesses, and directing JLL's Finance Department to re-review the holdback accounts for Tennery and Steinfeld's team. (DSOF Reply ¶85). Steinfeld requested to speak with representatives from JLL's Legal and Finance Departments to discuss JLL's investigations and to discuss complaints stemming from her review of the outcome of those investigations. (*Id.* ¶87). These meetings took place in October 2019. (*Id.* ¶88, PSAF Resp. ¶53). Ultimately, JLL's representatives concluded, once more, that "JLL did not violate company policies or procedures." (DSOF Reply ¶90). Moreover, JLL was unable to verify Steinfeld's spreadsheets and could not reconcile the spreadsheets with the data in JLL's internal systems. (DSOF Reply ¶54, Dckt. #203-14 at 17).z

**F.     Steinfeld's IRS Complaint and JLL's Alleged Retaliation.**

Based on her belief that JLL failed to properly investigate her concerns, Steinfeld filed a complaint with the Internal Revenue Service in November 2019. (PSAF Resp. ¶58). It was also Steinfeld's belief that, during this time, JLL retaliated against her for raising her concerns by prohibiting her from working with any of the former HFF employees who were integrated into JLL. (*Id.* ¶37; Dckt. #238-1 at 290). She also indicated that she was "removed from deals, had [her work in progress] stripped of deals [she] was working on for 3+ years," and was "completely isolated." (Dckt. #205-2).

9

### G. Steinfeld's Termination from JLL.

Ultimately, Steinfeld alleges, JLL unlawfully terminated her employment in December 2019 as retaliation for her continued reporting of "what she reasonably believed were JLL's tax violations and defrauding of its shareholders and investors." (Dckt. #1 ¶1). Steinfeld then brought this lawsuit, asserting claims for retaliation in violation of SOX, violations of the TFA and FLSA, breach of contract, unpaid wages, and unjust enrichment. (*See id.*, generally).

JLL, for its part, argues that it terminated Steinfeld's employment because she failed to meet her requirements to generate business and revenue, failed to properly integrate with her HFF colleagues, and was regularly absent from the office. (*See, e.g.*, DSOF Reply ¶¶73, 80–82). It is also JLL's position that Steinfeld is obligated to repay a pro rata share of her $300,000 bonus pursuant to the Agreement because she was employed by JLL for only three years and four months (August 1, 2016 to December 3, 2019), i.e., less than five years. (*Id.* ¶96). JLL brings counterclaims for defamation, breach of contract, and breach of fiduciary duty.

## III. ANALYSIS

JLL now moves for summary judgment on Steinfeld's federal and state law claims asserted against it, as well as on its state law counterclaims asserted against Steinfeld. Given that the Court's jurisdiction over both parties' state law claims hinges on the viability of Steinfeld's federal claims, the Court begins with the latter. For the reasons set forth below, the Court finds that Steinfeld has failed to provide sufficient evidence to enable her federal claims against JLL to

10

survive summary judgment, and relinquishes jurisdiction over the state law claims in accordance with Seventh Circuit guidance.

### A. JLL is Entitled to Summary Judgment on Steinfeld's Whistleblower Claims.

SOX protects whistleblowers from retaliation by prohibiting employers from "discharg[ing], demot[ing], suspend[ing], threaten[ing], harass[ing], or in any other manner discriminat[ing] against an employee in the terms and conditions of employment." 18 U.S.C. §1514A. This protection extends to employees who lawfully act "to provide information, cause information to be provided, or otherwise assist[] an investigation regarding any conduct which the employee reasonably believes constitutes . . . securities fraud, or violation of any rule or regulation of the SEC, or any federal law relating to fraud against shareholders." *Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009) (citing 18 U.S.C. §1514A(a)).

Similar to SOX, the TFA protects whistleblowers from retaliation when they provide authorities with information about tax misconduct. *See* 26 U.S.C. §7623(d). More specifically, and relevant here, the TFA prohibits retaliating against employees when they:

> provide information . . . regarding . . . any conduct which the employee reasonably believes constitutes a violation of the internal revenue laws or any provision of Federal law relating to tax fraud, when the information or assistance is provided to . . . a person with supervisory authority over the employee . . .

26 U.S.C. §7623(d)(1)(A).

In order to prevail on a whistleblower claim under SOX or the TFA, the employee must "prove by a preponderance of the evidence that (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Harp*, 558 F.3d at 723 (cleaned up); *Gammons v. Adroit Med. Sys., Inc.*, 91 F.4th 820, 826 (6th Cir. 2024) (setting out plaintiff's evidentiary burden under the TFA). If the employee

11

establishes these four elements, the employer may avoid liability if it can prove "by clear and convincing evidence" that it "would have taken the same unfavorable personnel action in the absence of that [protected] behavior." *Harp*, 558 F.3d at 723 (cleaned up); *see also Gammons, Inc.*, 91 F.4th at 826.

Part of the definition of "protected activity" is that the employee herself believed that the conduct she reported violated a law listed in Section 1514A(a) or internal revenue laws, and that belief must have been objectively reasonable. *Harp*, 558 F.3d at 723. Objective reasonableness is assessed "based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Id.*

Here, JLL contends that Steinfeld cannot establish the first element of her prima facie case, and that even if she establishes all four elements, JLL has met its burden to demonstrate it would have terminated her employment even absent her protected behavior. The Court need only address the first element—specifically, whether Steinfeld's belief that there was a violation of a law was objectively reasonable—to conclude that judgment should be entered in JLL's favor on Steinfeld's whistleblower claims.

> **1. Steinfeld's belief that there had been shareholder fraud was not objectively reasonable because her complaints pertained to immaterial matters.**

Steinfeld's whistleblower claims are centered on her belief that shareholder fraud resulted from JLL's practices with respect to her team's holdback accounts. (Dckt. #1 at 47). JLL argues that Steinfeld's belief that shareholder fraud had occurred was not objectively reasonable, and therefore her SOX claim fails as a matter of law. The Court agrees.

Relevant here, "the securities laws do not require companies to notify shareholders about every managerial hiccup or internal policy disagreement." *Verfuerth v. Orion Energy Sys., Inc.*,

879 F.3d 789, 794 (7th Cir. 2018).  Instead, "[t]o have an objectively reasonable belief there has been shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim of securities fraud . . . includ[ing] material misrepresentation or omission, scienter, [shareholder] loss, and [causation]."  *Id.*, *quoting Day v. Staples, Inc.*, 555 F.3d 42, 55–56 (1st Cir. 2009).  In other words, only complaints about material misrepresentations to shareholders will qualify as protected activity.  *Id.*  Courts have found that a whistleblower's complaints are not objectively reasonable where they pertain to a trivial amount of revenue compared to the reporting entity's total earnings during the relevant time period.  *See, e.g.*, *Hill v. Komatsu Am. Corp.*, No. 14-CV-02098, 2015 WL 5162129, at *5 (N.D.Ill. Aug. 26, 2015) (holding a SOX retaliation claim failed where the shortfall was "insignificant compared to the overall revenue of the company and would not be a material misrepresentation"); *Beacom v. Oracle Am., Inc.*, 825 F.3d 376, 381 (8th Cir. 2016).

Here, Steinfeld's complaints are not objectively reasonable because they relate solely to her and Tennery's holdback accounts[4]—her half of which amounted to $120,756.08—which represents a teeny tiny .0013% of the reporting entity's total revenue (over $17.9 billion) for 2019.[5]  (Dckt. #204-6 at 52).  This amount is immaterial in light of the company's overall

---

[4] Steinfeld argues that she "reasonably believed [JLL's] practices [with respect to the holdback accounts] to be pervasive through[out] JLL," (Dckt. #235 at 27), but her cited references do not support her assertion.  Moreover, in her Declaration, Steinfeld herself avers that she "had never seen [JLL's] practice before in the commercial real estate industry [including] in her prior employment [at a different] JLL [office.]" (Dckt. #238-1 at 288).  Indeed, Steinfeld has not pointed to any evidence, other than her speculative beliefs, that JLL engaged in similar practices, which she claims were improper, with respect to any other holdback accounts.  The Court thus finds her complaints are limited to holdback account practices for which she has personal knowledge.  *Payne*, 337 F.3d at 772 (explaining "that affidavits fail to thwart summary judgment [where] they are not based on personal knowledge" but rather "speculation, hunches, [or] intuitions") (cleaned up).

[5] Steinfeld objects to JLL's use of the total revenue for Jones Lang LaSalle Incorporated, rather than JLL Americas (the named defendant).  Because Jones Lang LaSalle Incorporated is the "reporting entity," and

financial position, such that Steinfeld's belief that JLL engaged in shareholder fraud was objectively not reasonable as a matter of law. *See Hill*, 2015 WL 5162129, at *5 (granting summary judgment in favor of an employer on an employee's SOX retaliation claim, finding that the employee's complaint was not objectively reasonable where complained-of conduct involved .5% to 1% of the employer's total revenue); *Beacom*, 825 F.3d at 381 (affirming summary judgment in favor of employer on SOX claim because "$10 million is a minor discrepancy to a company that annually generates billions of dollars"); *Westawski v. Merck & Co.*, 215 F.Supp.3d 412, 429 (E.D.Pa. 2016), *aff'd*, *Westawski v. Merck & Co.*, 739 Fed.Appx. 150 (3d Cir. 2018) (granting summary judgment for defendant on plaintiff's SOX claim where the relevant "study cost Merck just over $200,000, or 0.000004% of its sales revenue in 2010," and explaining it could not "be said that such a small amount meets the materiality requirement for an objectively reasonable belief in shareholder fraud") (collecting cases); *Nazif v. Comput. Scis. Corp.*, No. C-13-5498 EMC, 2015 WL 3776892, *6 (N.D.Cal. June 17, 2015) (granting summary judgment on plaintiff's SOX claim based on a finding that "a $1–2 million overstatement of revenue would be a "minor or technical violation" that is immaterial "where the company "reported annual revenue of over $14 *billion* dollars during the period of Nazif's employment) (emphasis in original).

Accordingly, the Court concludes that Steinfeld's belief that JLL was defrauding its shareholders was objectively unreasonable, and her SOX claim thus fails as a matter of law. *See Gibney v. Evolution Mktg. Rsch., LLC*, 25 F.Supp.3d 741, 748 (E.D.Pa. 2014) ("Nothing in the text of § 1514A . . . suggests that SOX was intended to encompass *every* situation in which any

---

the shareholders of that entity are the shareholders that would be harmed by the fraud alleged by Steinfeld, the Court refers to the total revenue for Jones Lang LaSalle Incorporated.

14

party takes an action that has some attenuated, negative effect on the revenue of a publicly-traded company, and by extension decreases the value of a shareholder's investment.") (emphasis in original).

### 2. Steinfeld's belief that there had been shareholder and tax fraud was not objectively reasonable because her concerns were properly addressed.

Even assuming Steinfeld could demonstrate that her initial concerns about the holdback accounts and JLL's practices were reasonable, those concerns became objectively *unreasonable* after JLL employees, some of whom were finance professionals, investigated her claims and determined there were no violations. In particular, "[a] company's explanations given to the employee for the challenged practices are also relevant to the objective reasonableness of an employee's belief." *Day*, 555 at 58. Moreover, complaints that "initially reflected a reasonable concern" can "cease[] to be reasonable after [the employer's] employees reiterate[] the rationales for the [challenged conduct], and assure[] Plaintiff that no fraud [is] being committed." *Id.*

Here, after Steinfeld raised her initial concerns, she participated in multiple meetings over the course of several months with JLL employees from various departments, including JLL's finance department, who detailed the holdback accounts, attempted to explain the calculations to her, and assured her that no improper accounting had occurred. (DSOF Resp. ¶37; DSOF Reply ¶¶49, 88). Despite these explanations, Steinfeld nonetheless persisted with her assertion that JLL's holdback practices violate tax laws, even though she struggled to testify as to her own understanding of the accounting terminology she was using. (*See* Dckt. #203-7 at 28 (failing to provide a specific answer as to her understanding of the term "revenue")). Moreover, the record reflects that the holdback accounts were included in JLL's financial statements, which were in turn audited by a third party, (DSOF Resp. ¶23; Dckt. #203-9 at 47), which found that JLL's

15

consolidated financial statements presented "fairly, in all material respects, the financial position of [JLL] . . . in conformity with U.S. generally accepted accounting principles." (*See, e.g.*, Dckt. #204-6 at 77).

On this record, the Court finds that the explanations and assurances provided by multiple JLL employees, including finance professionals, following multiple investigations, coupled with the confirmations of the third-party auditor, render Steinfeld's complaints that JLL had violated a law listed in Section 1514A(a) or internal revenue laws objectively unreasonable—particularly in light of her own difficulties defining the accounting terms at issue. Accordingly, the Court finds that JLL is entitled to summary judgment on Steinfeld's whistleblower claims under SOX and the TFA. *See e.g.*, *Day v. Staples*, 573 F.Supp.2d 336, 347 (D.Mass. 2008) (finding plaintiff's "ignorance of financial metrics, coupled with Staples' repeated (and valid) explanations, show that [p]laintiff did not harbor a *reasonable* belief that Staples was perpetrating fraud against its shareholders.") (emphasis in original); *see also Rocheleau v. Microsemi Corp., Inc.*, No. SACV1301774CJCJPRX, 2015 WL 12696113, at *7 n.5 (C.D.Cal. Mar. 2, 2015), *aff'd,* 680 Fed.Appx. 533 (9th Cir. 2017) ("Ms. Rocheleau's beliefs, which "were not initially reasonable as beliefs in shareholder fraud," completely "ceased to be reasonable" after her supervisor directly contradicted any subjective belief that Ms. Rocheleau was to engage in fraudulent activity); *Clegg v. Amcor Rigid Packaging USA, LLC*, No. CV 5:21-232-DCR, 2022 WL 23215, at *3 (E.D.Ky. Jan. 3, 2022) (holding the plaintiff's belief that defendant was committing shareholder fraud was not subjectively reasonable after management indicated that it would resolve the complained-of problems).

16

**B.      JLL is Entitled to Summary Judgment on Steinfeld's FLSA Claim.**

The FLSA requires an employer to pay overtime compensation to any employee that works more than forty hours in a workweek. *See* 29 U.S.C. §§207(a), 213. There are, however, exemptions to the FLSA's overtime pay requirement. *See* 29 U.S.C. §213(a)(1); 29 C.F.R. §541.601. One such exemption is the "highly compensated employee exemption," which JLL argues applies here. That exemption applies if: (1) the employee's "primary duty include[d] performing office or non-manual work;" (2) the employee receive[d] total annual compensation of at least $107,432; and (3) the employee "customarily and regularly perform[ed] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. §541.601.[6] As the employer, the burden of proving this exemption is on JLL. *See Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 571 (7th Cir. 2012).

Here, there is no dispute that while Steinfeld was employed by JLL, her primary duty included performing office or non-manual work, and her total compensation exceeded $107,432 annually. *See* Dckt. ##203-21, 204-9–11; *supra* n.2. The Court thus turns to the third element. To satisfy the third element, JLL must show that Steinfeld customarily and regularly performed any one or more of the exempt duties or responsibilities of an administrative employee. 29 C.F.R. §541.601. "Whether employees' 'particular activities excluded them from the overtime benefits of the FLSA is a question of law.'" *Perez v. Express Scripts, Inc.*, No. 23-1730, 2024 WL 957978, at *3 n.6 (3d Cir. Mar. 6, 2024), *quoting Resch v. Krapf's Coaches, Inc.*, 785 F.3d 869, 872 n.6 (3d Cir. 2015) (cleaned up). Notably, "[a] high level of compensation is a strong indicator of an employee's exempt status," and "the highly compensated employee exemption

---

[6] 29 C.F.R. §541.601 was amended effective July 1, 2024; however, the previous version, effective June 8, 2020 through June 30, 2024, as cited here, remains applicable to this case because Steinfeld's claim was filed prior to that date.

17

eliminate[s] the need for a detailed analysis of the employee's job duties." *Perez v. Express Scripts, Inc.*, No. 19CV7752JXNESK, 2023 WL 2570145, at *3 (D.N.J. Mar. 20, 2023), *aff'd,* No. 23-1730, 2024 WL 957978 (3d Cir. Mar. 6, 2024) (cleaned up); *see also Smith v. Ochsner Health Sys.*, 353 F.Supp.3d 483, 497–98 (E.D.La. 2018), *aff'd,* 956 F.3d 681 (5th Cir. 2020) (explaining that "courts, in a pre-*Encino* world, applied the exemptions narrowly against the employer . . . and ignored the regulation's directive to forego a rigorous analysis of the employee's job duties in light of the employee's high compensation"). Thus, JLL's burden is met if it can show "just one of [Steinfeld's] duties or responsibilities" was "of an administrative character related to [JLL's] management or general business operations and [was] customarily and regularly performed by [Steinfeld]." *Smith*, 353 F.Supp.3d at 498 (cleaned up). JLL has done so here.

To begin, Steinfeld herself alleged that her "duties broadly included . . . negotiating sales" and representing JLL by "communicating with potential investors and buyers," (Dckt. #1 ¶28)[7]—both of which are duties that the Seventh Circuit has held are administrative functions, *see Schaefer-LaRose*, 679 F.3d at 574 (explaining that "the administrative operations of the business include the work of employees servicing the business, such as, for example, . . . planning, negotiating, representing the company, [and] promoting sales") (cleaned up); *see also Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1073 (7th Cir. 1997), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013) (explaining that "time negotiating with client" was a "classic administrative function"). The Court therefore concludes that there is

---

[7] Plaintiff's allegations in her complaint are judicial admissions that she cannot contradict and may be used against her. *See Moran v. Calumet City*, 54 F.4th 483, 493–94 (7th Cir. 2022); *United States v. Kasuboski*, 834 F.2d 1345, 1350 (7th Cir. 1987) ("[a]ffidavits and depositions entered in opposition to summary judgment that attempt to establish issues of fact cannot refute default admissions").

no genuine dispute that Steinfeld's duties and responsibilities while employed by JLL involved at least one duty or responsibility that was administrative in nature, and that it was customarily and regularly performed by Steinfeld.

Moreover, Steinfeld, unsurprisingly, fails to cite any authority where an office employee who was as highly compensated as her (i.e., earning in excess of $227,000 annually) failed to fall under the FLSA's highly compensated employee exemption. Instead, she argues that her primary duty—which she asserts was making sales—"disqualifies her from the exemption" because that duty was not administrative in nature. (Dckt. #235 at 38). Steinfeld bases this argument on her reading of another FLSA exemption—the administrative exemption. "To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer." 29 C.F.R. §541.201. Steinfeld conflates the requirements of the two exemptions at issue. As the regulation explains, "[a] high level of compensation is a strong indicator of an employee's exempt status," 29 C.F.R. §541.601(c); thus, for the highly compensated employee exemption to apply, the employer need only show that one of the purportedly exempt employee's duties or responsibilities is of an administrative character—"it need not be [her] primary duty," *Ochsner Health Sys.*, 353 F.Supp.3d at 498; *see also Perez*, 2023 WL 2570145, at *3 ("To satisfy the third prong, the employee need only perform one or more exempt duties more than occasionally."); *Thomas v. TEKsystems, Inc.*, No. 2:21-CV-460, 2025 WL 756067, at *8 (W.D.Pa. Mar. 10, 2025) ("An exempt duty is more than occasional if it is performed normally and recurrently every workweek, but not if it is an isolated or one-time task.").

As set forth above, JLL has met its burden to demonstrate that Steinfeld customarily and regularly performed at least one of the exempt duties or responsibilities of an executive,

administrative, or professional employee, thereby satisfying the third element to qualify Steinfeld as a highly compensated employee that is exempt from the FLSA's overtime pay requirements. The Court therefore grants summary judgment in JLL's favor on Steinfeld's FLSA claim.

###### C.    The Court Relinquishes Jurisdiction Over the Parties' State Law Claims.

For the reasons set forth above, summary judgment is warranted on Steinfeld's federal claims. All that remains are Steinfeld's state law claims against defendant for breach of contract, common law unpaid wages, and unjust enrichment, and JLL's state law counterclaims for defamation *per se*, defamation *per quod*, breach of contract, and breach of fiduciary duty. The Seventh Circuit has described a "sensible presumption that if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). Accordingly, the Court, in its discretion, declines to exercise supplemental jurisdiction over Steinfeld's pendent state law claims and JLL's pendent state law counterclaims. *See Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); 28 U.S.C. §1367(c)(3). Steinfeld's state law claims against JLL and JLL's state law counterclaims against Steinfeld are dismissed without prejudice so that they may be pursued in a state forum. *Doxtator v. O'Brien*, 39 F.4th 852, 867 (7th Cir. 2022) ("Without any federal claims over which it had original jurisdiction, the district court's decision not to exercise supplemental jurisdiction over the pendent state law claims was not an abuse of discretion.").

### CONCLUSION

For the foregoing reasons, defendant JLL's motion for summary judgment, (Dckt. #200), is granted as to Steinfeld's federal claims arising under the Sarbanes-Oxley Act of 2002, the

Taxpayer First Act, and the Fair Labor Standards Act. Steinfeld's state law claims against JLL and JLL's state law counterclaims against Steinfeld are dismissed without prejudice.

**DATE: March 30, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**

21